J-S40004-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DAMIR WILLIAMS | : | |
| | : | |
| Appellant | : | No. 2882 EDA 2019 |

Appeal from the Judgment of Sentence  Entered May 24, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003682-2018

BEFORE:   SHOGAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY SHOGAN, J.:                    **FILED DECEMBER 04, 2020**

Appellant, Damir Williams, appeals from the judgment of sentence entered May 24, 2019, following his conviction by a jury of one count each of second-degree murder, robbery, conspiracy to commit burglary, and criminal trespass.[1]  We affirm.

The trial court summarized the facts of this case as follows:

At trial, the Commonwealth presented the testimony of Philadelphia [P]olice [O]fficers John Durkin, Barry Sudler, Christopher Jones, and Matthew Lally, Philadelphia [P]olice [D]etectives Michael Cannon, Michael Corson, Daniel Plaza, and Thorsten Lucke, Burlington County [M]edical [E]xaminer Dr. Ian Hood, Fred Martella, Brittney Rehrig and Andrea Williams, and co-defendant Mark McLaughlin.[3]  [Appellant] presented the character testimony of Angel Santiago and Loretta Amons.  Viewed in the

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(b), 3701(a)(1)(i), 903, 3502(a)(1)(i), and 3503(a)(1), respectively.

light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

> ³ At Docket No. CP-51-CR-0003681-2018, Mark McLaughlin pled guilty to one count each of murder of the third degree (18 Pa.C.S. § 2502(c)), conspiracy to commit murder of the third degree (18 Pa.C.S. § 903), and burglary (18 Pa.C.S. § 3502), regarding the burglary and murder here at issue. At Docket No. CP-51-CR-0003683-2018, McLaughlin pled guilty to one count of burglary (18 Pa.C.S. § 3502), regarding the previous burglary of the Martella home discussed in the text, *infra*.

Mark McLaughlin lived at 7330 Hill Road, next-door to 7332 Hill Road, where the decedent, Anthony Martella, lived with his sister, Rosemary Martella.⁴ On February 16, 2017, McLaughlin broke into the Martella home looking for money to support his drug habit. As a result of that break-in, he was arrested and charged with burglary on May 1, 2017. He was held in prison awaiting trial, but was released on September 13, 2017, at 3:00 a.m. The charges had been dismissed, since Rosemary and Anthony did not appear to testify.

> ⁴ Because Anthony and Rosemary Martella have the same last name, they will be referred to hereafter using their first names.

On the very day he was released from prison, McLaughlin decided that he would break into the Martella home again. He met up with [Appellant], Damir Williams, whom he had known for several years. McLaughlin told [Appellant] that he had previously burglarized the Martella home, and that they could do it again to get some money.

Around 5:00 a.m. that morning, [Appellant] and McLaughlin went to the back door of the Martella home. Anthony answered the door and invited McLaughlin and [Appellant] in the home. [Appellant] then choked Anthony and jumped on top of him. McLaughlin and [Appellant] found tape inside the home and [Appellant] tied Anthony up while McLaughlin held him down. McLaughlin then went upstairs to Rosemary's bedroom to grab money. On the second floor, McLaughlin found Rosemary in her room and asked her for money. McLaughlin found and took a

purse that contained $150, car keys, and some bank cards. McLaughlin and [Appellant] then left the home and used the car keys to take Rosemary's car. At some point McLaughlin cut the phone lines using scissors.

Around 7:45 a.m., Rosemary went to the home of a neighbor, off-duty police officer John Durkin. Rosemary told Officer Durkin that McLaughlin had gotten into her home again [and] had cut her phone line. Officer Durkin knew that McLaughlin had previously broken into the Martella home and that McLaughlin had been in prison for the break-in. Officer Durkin and Rosemary called her other brother, Fred Martella, and then started to call 911 when Rosemary told Officer Durkin that Anthony was tied up in the basement. Officer Durkin and Rosemary then went into the Martella home. When they arrived, Anthony was untied but kept rubbing his hands over his chest, was short of breath, and seemed increasingly uncomfortable. Officer Durkin also noticed a broken lamp in the middle bedroom, tape on the basement floor at the bottom of the stairs, and that Rosemary's car was missing from her driveway.

Between 8:00 and 8:30 a.m., an ambulance arrived and took Anthony to Roxborough Hospital. The same day, Detective Michael Cannon went to the hospital, but was unable to interview Anthony because Anthony was in too much pain. Detective Cannon received a phone call later that day that Anthony had been transferred to Temple Hospital because he was in more serious condition than previously thought.

On September 18, 2017, McLaughlin was interviewed by detectives at the Northwest Detective Division. During the interview, McLaughlin admitted to entering the Martella home with [Appellant] on September 13, 2017, and stated that he saw [Appellant] hit, choke, and tie up Anthony.

Rosemary's car was found on Welsh Road in close proximity to McLaughlin's grandmother's house. Rosemary's purse, taken from the second floor bedroom of her home, was found inside the car. The car was dusted for fingerprints, revealing a fingerprint from [Appellant] on the passenger side door handle.

Prior to the break-in on September 13, 2017, Rosemary and Anthony were in good health and able to live alone. Following the break-in, Anthony was transported to Roxborough hospital. He

- 3 -

never regained his ability to speak and could no longer stand or walk. At Roxborough Hospital, he was put on a ventilator. After about two weeks, doctors performed a tracheostomy. Anthony was unconscious and not able to swallow or eat, so a feeding tube was inserted. Once he could breathe on his own he was transferred to a nursing home. Because he could not clear his airway by coughing or swallowing properly, he had episodes where he would aspirate secretions from his nose and mouth into his lungs, causing pneumonia.

Doctors determined that Anthony had suffered a hypoxic brain injury, that is, brain injury caused by a lack of oxygen getting to the brain. The injury was permanent, and Anthony had no chance to recover. After two or three episodes of aspiration pneumonia, his family made the decision to stop active treatment and for Anthony to go into hospice care. He remained in a nursing home until he died on March 15, 2018, at the age of 76.

An autopsy was done on Anthony by Dr. Ian Hood, a medical examiner for Burlington County and an expert in the field of forensic pathology. Dr. Hood determined that Anthony's immediate cause of death was pneumonia, but that the pneumonia was caused by the hypoxic brain injury that Anthony had previously sustained during the burglary. Dr. Hood explained that the brain injury was Anthony's primary cause of death as it was the cause of the pneumonia from which Anthony ultimately died.

Trial Court Opinion, 12/31/19, at 2–5 (internal citations to the record omitted).

Following a five-day jury trial, Appellant was convicted of the above-described charges. On May 24, 2019, the trial court sentenced Appellant to life imprisonment for second-degree murder, with a consecutive term of imprisonment of ten to twenty years for conspiracy to commit burglary, and no further penalty for criminal trespass. The conviction for robbery merged with second-degree murder for the purposes of sentencing.

Appellant filed a timely post-sentence motion, which was denied on September 13, 2019. Appellant filed a notice of appeal.[2] Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant raises the following issues, which are identical to the issues raised in Appellant's Rule 1925(b) statement:

I. Whether the [c]ourt erred when it denied the Appellant's request to provide the deliberating jury with a written explanation of the defense of character and reputation evidence where the relevant Rule provides that a jury can be furnished with a written explanation of the charges and the defenses?

II. Whether the Appellant's conviction for Murder in the Second Degree was based upon insufficient evidence where the uncontested evidence at trial was that the intervening cause of the decedent's death was the family's decision to withhold life saving treatment to cure the decedent's pneumonia where such treatment had been successful two times in the past?

III. Whether the Appellant's convictions were against the weight and credibility of the evidence and shocking to one's sense of justice where the only witness who placed the Appellant inside of the home was the corrupt and polluted co-defendant, where the medical records refuted the contention that the victim had been strangled and where the uncontested evidence was that there was an intervening decision by family members of the decedent to withhold necessary medical treatment to the victim to cure his pneumonia that interrupted the chain of events that led to the decedent's death?

_____

[2] Appellant filed his notice of appeal to this Court from the denial of post-sentence motions on September 13, 2019. Notice of Appeal, 10/7/19. In a criminal action, the appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions. **Commonwealth v. Kuykendall**, 2 A.3d 559, 560 n.1 (Pa. Super. 2010). We have amended the caption accordingly.

Appellant's Brief at 6–7 (re-ordered for ease of disposition).

Appellant first asserts the trial court "lacked a defensible reason" for denying Appellant's request to provide the jury with a written explanation of character and reputation evidence. Appellant's Brief at 30–31. This issue is premised upon Pa.R.Crim.P. 646, "Material Permitted in Possession of the Jury," which provides, in pertinent part as follows:

> (A) Upon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (C).
>
> (B) The trial judge may permit the members of the jury to have for use during deliberations written copies of the portion of the judge's charge on the elements of the offenses, lesser included offenses, and any defense upon which the jury has been instructed.

Pa.R.Crim.P. 646 (A) and (B).

Appellant next argues that the Commonwealth failed to present sufficient evidence to support the conviction for second-degree murder. Appellant's Brief at 38–39. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. ***Commonwealth v. Green***, 203 A.3d 250, 253 (Pa. Super. 2019), *appeal denied*, 216 A.3d 1036, 54 WAL 2019 (Pa. July 30, 2019). "[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence."

*Commonwealth v. Colon-Plaza*, 136 A.3d 521, 525–526 (Pa. Super. 2016) (quoting *Commonwealth v. Robertson-Dewar*, 829 A.2d 1207, 1211 (Pa. Super. 2003)). It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. *Commonwealth v. Tejada*, 107 A.3d 788, 792–793 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. *Commonwealth v. Mucci*, 143 A.3d 399, 409 (Pa. Super. 2016). Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Commonwealth v. Rogal*, 120 A.3d 994 (Pa. Super. 2015).

Finally, Appellant contends the verdict was against the weight of the evidence, a claim Appellant raised in his post-sentence motion. Appellant's Brief at 31–37, Post Sentence Motion, 5/31/19, at ¶ 3. The standard in reviewing a weight-of-the-evidence claim is well settled:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis and citations omitted).

We have considered the arguments of the parties, the relevant law, and the complete record.  The trial court aptly addressed all of Appellant's issues at length and authored a cogent, thorough opinion.  For this reason, we affirm the judgment of sentence on the basis of the trial court's December 31, 2019 Pa.R.A.P. 1925(a) opinion.  In the event of future proceedings, the parties are directed to attach a copy of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/4/20