J-A24044-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA

v.

RASHEEM JAMAR TILLERY

Appellant

: IN THE SUPERIOR COURT OF
:        PENNSYLVANIA
:
:
:
:
:
:
:
:
:
: No. 526 EDA 2019

Appeal from the Order Entered January 18, 2019
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0005768-2017

BEFORE:   BENDER, P.J.E., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED DECEMBER 16, 2019**

Rasheem Jamar Tillery (Tillery) appeals from the judgment of sentence entered in the Court of Common Pleas of Delaware County, after a non-jury trial.  Tillery was found guilty of two counts of possession with intent to deliver a controlled substance, two counts of possession of a controlled substance, possession of drug paraphernalia, and two counts of conspiracy to possess with intent to deliver marijuana and cocaine.[1]   Upon careful review, we affirm.

The facts underlying this appeal are as follows:

On September 1, 2017 members of the Chester City Narcotics Unit and the Delaware County Task Force executed a warrant that authorized a search of 1209 Clover Lane in Chester.  Defendant, Rasheem Tillery, and Anthony Young were present when the warrant was executed.  The search resulted in the seizure of more than nine hundred dollars and thirty-four "bags" of cocaine which

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 Pa. C.S.A. ¶¶ 780-113(A)(30), (A)(16), (A)(32), and ¶ 903.

were found under an air mattress in a second-floor bedroom.  Also seized was a plastic bag containing hundreds of new plastic containers that are commonly used to package cocaine, a clear sandwich bag containing twelve of the same clear plastic jars that contained cocaine, three pill bottles bearing the name "Anthony Young," 21.4 grams of "crack" cocaine in a clear sandwich bag, 11.6 grams of cocaine, 22.9 grams of marijuana, new clear black Ziploc bags and a plate containing cocaine residue that was found along with a razor blade.  Both defendant and Young were arrested and charged with, *inter alia*, multiple counts of possession with intent to deliver and criminal conspiracy.

Trial Court 1925(a) Opinion (Tr.Ct.Op.) at 1-2.

On December 4, 2018, Tillery was sentenced to an aggregate term of 40 to 120 months' incarceration.  On December 14, 2018, an amended sentencing order was entered.   On January 4, 2019, Tillery filed, and was granted, an unopposed petition for leave to file motion for reconsideration *nunc pro tunc*.[2]   Tillery filed his post-sentence motion on January 4, 2019, and on January 18, 2019, the post-sentence motion was denied.  On February 13, 2019, counsel for Tillery filed a notice of appeal.[3]

Tillery raises the following claims for our consideration:

1. Whether…the evidence introduced at trial was sufficient to prove beyond a reasonable doubt that Mr. Tillery (a) conspired with another to possess or sell drugs, (b) was aware that drugs were

_____

[2] In a footnote to its 1925(a) Opinion, the Trial Court noted that after sentencing, trial counsel moved to withdraw his appearance.  The motion was granted and new counsel was appointed on December 18, 2018.  New counsel filed the motion seeking leave to file post-sentence motions *nunc pro tunc*. That motion was granted and a motion for reconsideration was filed, and subsequently denied, on January 18, 2019.  Tr.Ct.Op. at 2, n.5.

[3] Tillery filed his concise statement of errors complained of on appeal on March 8, 2019, and the Trial Court entered its opinion on March 18, 2019.

being sold by Mr. Young at the residence where he was arrested, or (c) personally possessed or sold drugs from that location or anywhere else.

2. Whether the trial court committed error by permitting hearsay statements made by police officers who were not identified and whom Mr. Tillery had no opportunity to confront.

Tillery's Brief at 4 (suggested responses omitted).

Tillery asserts that the evidence presented before the Trial Court was insufficient to support his convictions for possession with intent to deliver a controlled substance and conspiracy. Specifically, he contends, first, that he was unaware that illegal drugs were being sold from the residence, that he did not constructively possess any drugs and paraphernalia, and only his co-defendant, Anthony Young, sold drugs from the residence. Tillery's claim fails.

A determination of evidentiary sufficiency presents a question of law. As such, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Russell*, 209 A.3d 419, 426 (Pa. Super. 2019). In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. *Id*. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. *Commonwealth v. Colon-Plaza*, 136 A.3d 521, 525-26 (Pa. Super. 2016). It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. *Commonwealth*

*v. Tejada*, 107 A.3d 788, 792-3 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the crime by means of circumstantial evidence. *Commonwealth v. Mucci*, 143 A.3d 399, 409 (Pa. Super. 2016).

In order to establish the offense of possession with intent to deliver, the Commonwealth must prove beyond a reasonable doubt that a defendant possessed the controlled substance with the intent to deliver it. *Commonwealth v. Kirkland*, 831 A.2d 607, 610 (Pa. Super. 2003). "Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as "conscious dominion."…We subsequently defined "conscious dominion" as "the power to control the contraband and the intent to exercise that control."" *Commonwealth v. Mudrick*, 507 A.2d 1212-13 (Pa. 1986). To establish the existence of a criminal conspiracy, the Commonwealth must prove an agreement to commit an unlawful act; circumstantial evidence may provide proof of conspiracy. *Commonwealth v. Perez*, 931 A.2d 703, 707-708. The conduct of the parties and the circumstances surrounding such conduct may create a "web of evidence" linking the accused to the alleged conspiracy beyond a reasonable doubt. *Id*.

Here, no drugs were found on Tillery's person, and he argued that, unlike his co-defendant, he had not been previously identified or targeted by the police in its investigation of his co-defendant; Tillery pointed to the testimony of his co-defendant, who stated that Tillery, a barber, was at the

home where the raid occurred for the purpose of cutting the co-defendant's hair, and was unaware that there were drugs in the house. Tillery's Brief at 7-8. However, the Commonwealth established Tiller's conscious dominion and control over controlled substances through police testimony deemed credible by the Trial Court. The testifying officers approached the property and saw two men sitting at a folding card table in a living room that was essentially empty except for a police scanner. October 6, 2018 Transcript of Proceedings (N.T.) at 10-11, 38, 42. When the men saw the search team approach, they took evasive action – Anthony Young, the co-defendant, ran to the kitchen and attempted to dispose of a bag containing crack cocaine, packaged in clear tiny jars with snap lids on top. N.T. at 39-40. After running to the front door and slamming and dead-bolting it, Tillery ran up the stairs, located immediately in front of the door, to a bathroom located at the top of the stairs, and then down the hall and into a bedroom. N.T. at 11-12, 15-16, 39. When a testifying officer entered the bedroom, Tillery was observed crouching next to an air mattress, which was found to contain thirty-four individual packets of cocaine and $900 in cash. N.T. at 16-18. The other testifying officer, who was certified as an expert in narcotics investigations and was part of the team who executed the search warrant, stated that given the lack of furnishings in the bedroom room along with the lack of furnishings in the entire property, the circumstances suggest that the property served not as a residence but as a "trap" house where drugs are sold by dealers who have no legitimate connection to the property but use it only as a location for sales; the officer

also confirmed that there was no evidence that Anthony Young held a lease to the property. N.T. at 72, 76, 81. The Trial Court properly concluded that Tillery's actions, taken together with these circumstances proved beyond a reasonable doubt that Tillery controlled the contraband along with Young and acted in concert with him to hide the evidence." *See* Tr.Ct.Op. at 11.

Tillery argues that this Court's holding in *Commonwealth v. Rodriguez*, 618 A.2d 1007, 1008 (Pa. Super. 1993) requires the Trial Court to find that constructive possession was not proven beyond a reasonable doubt. We disagree. In *Rodriguez*, where we found the evidence insufficient to establish constructive possession as here, no drugs were found on the appellant's person. However, unlike the case *sub judice*, the *Rodriguez* court found evidence of the appellant's control lacking, in that many seized items were found hidden from view, and others seized in view were found inconsistent with criminal activity. Unlike here, there was evidence in *Rodriguez* that the other man found at the scene actually lived in the one-room apartment containing an open walk-in closet, a sink, a bed and a dresser; the only evidence linking the appellant was his presence, and the fact that at the time of the raid he was holding a key to the apartment. Here, there is ample evidence, when viewed in the light most favorable to the Commonwealth, to support a finding of Tillery's constructive possession where Tillery was both aware of the presence of drugs, and engaged in the criminal activity.

Tillery argues that the Trial Court erred by permitting hearsay statements by unidentified police officers whom Tillery was unable to confront. In his brief, Tillery alleges the Trial Court relied upon hearsay statements contained in a police evidence report prepared by Officer Goldschmidt and introduced into evidence at trial as Exhibit C-7, as well as testimony by Officer Goldschmidt in reliance upon the police incident report.[4] Tillery contends that no evidence was introduced by the testifying officers that (i) Tillery was observed, upon approach to the house, sitting at a table in the living room with Anthony Young; (ii) Tillery ran to the front door and slammed it shut; (iii) the sound of the dead bolt being closed was heard and Tillery was seen running up the stairs; or (iv) Tillery was seen running from the bathroom into the bedroom and throwing something under the mattress. Tillery, however, failed to raise a challenge to the introduction of hearsay evidence at trial, or in his concise statement of errors complained of on appeal. This claim is therefore waived. **Commonwealth v. Stiles**, 143 A.3d 968, 982 (Pa. Super. 2016). Furthermore, even if we were to find this argument not waived, it would not alter the fact that nothing in the record suggests that hearsay evidence contributed in any way to the Trial Court's verdict, and Tillery suffered no prejudice therefrom.

---

[4] The police incident report includes the statement that "Tillery was initially observed flushing the toilet and running from the bathroom into the bedroom, where he was then observed throwing items under an air mattress." Exhibit C-7 at 6.

There was first-hand evidence that Tillery got up from the table in the dining room, slammed the door, locked the deadbolt, and ran up to the second floor and into a bedroom, and ample circumstantial evidence that he then attempted to hide 34 packets of cocaine and $900 in cash.

Detective Bannar testified he saw one male seated at a card table and another male (whose face he could not see) running toward the front door as the "stack"[5] of officers approached the house. N.T. at 10-11. Detective Bannar heard someone slam the open door and lock the dead bolt. *Id*. at 11-12. Detective Bannar testified that the stack of officers of which he was a part rammed the front door, and while some of the officers pursued one of the men who had been observed seated at the card table as he ran toward the kitchen, Detective Banner followed three or four members of the stack up the stairway, which was immediately in front of the entrance to the house. *Id*. at 12-14. Midway up the steps, Detective Bannar observed a male, whom he identified in court as Tillery, exiting a bathroom at the top of the stairs and running down the hall towards the front of the house. *Id*. at 13-14. Detective Bannar testified that there was no one else on the second floor of the house. *Id*. at 16. He testified that he heard, but did not see, a bedroom door slam; the first officer kicked the door in, and Detective Bannar stated that he observed Tillery

---

[5] A "stack" of officers describes the group of approximately ten officers who breached the property; there was a shield man armed with an AR-15 who entered first in case firearms come into play, followed by the rest of the task force. Detective Banner testified that upon initial entry to the house, he was in the middle of the stack, "maybe fifth or sixth." N.T. at 10, 23.

crouched down next to an air mattress in the room. *Id*. Other than police officers, there were no other persons in the room; Detective Banner lifted up the air mattress, and observed that "it looked like someone threw a deck of cards under the bed. There was money scattered all over the place…there was a clear sandwich bag with little individual clear bags with crack cocaine in them. I think there was 34 total." *Id*. at 18. Detective Bannar stated that Tillery had "a good two seconds in that room by himself." *Id*. at 28.

Sergeant Goldschmidt, the expert in the area of narcotics and narcotics investigations, was the fourth officer in the stack as they entered the house. He testified that as they approached the house, he observed through open windows the silhouette of two individuals sitting at a card table in the living room. N.T. at 38. He observed the front door close, and upon entry, he remained on the first floor and followed the man who went running into the kitchen. *Id.* at 39. Sergeant Goldschmidt testified that when he came through the front door, he saw Tillery at the top of the stairs. *Id*. at 63. Sergeant Goldschmidt observed Anthony Young, the co-defendant throwing bags into the sink that were found to have contained crack cocaine. *Id*. at **40**. He also stated that on the card table in the living room, he observed three cell phones, $25 cash, and a set of keys to the front door; on the floor by the steps was a police scanner, set to Sector 3, which is the Chester City police department. *Id*. at 42. He testified that inside the kitchen cabinets were drug paraphernalia, cocaine, marijuana, new and unused bags similar to

the bags found under the air mattress, and pill bottles with the co-defendant's name on them. *Id*. at 44-47.

The Trial Court found credible the testimony of the two police department witnesses, and assigned no weight to the testimony of the co-defendant that the policemen who testified were "lying;" that the front door was already closed and locked when the police arrived; that he never ran into the kitchen but remained in the living room; that his childhood friend Tillery was upstairs in the bathroom when the police rammed his front door; and that although there was a pile of money neatly stacked, there were no drugs hidden under the air mattress. Tr.Ct.Op. at 12; *see also* N.T. at 100-112. There was no testimony whatsoever at the trial from any witness that Tillery was observed by another officer flushing a toilet or putting something under the mattress, nor was any argument made at trial that Tillery was observed doing so. Indeed, the Trial Court made no reference to the content of Exhibit C-7, and the only time it was mentioned was during Tillery's counsel's cross examination of Sergeant Goldschmidt, when he was asked what date and time it was completed, whether it contained a list of items recovered, and whether it included information as to whether the front door had been closed by someone within the house when the officers approached. N.T. at 77-78. In its opinion, the Trial Court noted only that "circumstantial evidence demonstrates that [Tillery] attempted to hide thirty-four individual packets of cocaine and $900 in cash." Tr.Ct.Op. at 11. Under these circumstances, the admission of Exhibit C-7, the police incident report, was harmless. "Harmless

error exists if the record demonstrates either: (i) the error did not prejudice the defendant or the prejudice was *de minimis*, or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." ***Commonwealth v. Hairston***, 84 A.3d 657, 671-72 (Pa. 2014). "Any concern of a prejudicial effect on the trier of fact does not predominate in non-jury trials, because trial judges sitting as fact finders in criminal cases are presumed to ignore prejudicial evidence in reaching a verdict." ***Commonwealth v. Irwin***, 579 A.2d 955, 957 (Pa. Super. 1990). Here, it is clear from the Trial Court opinion that it did not rely on the hearsay contained in Exhibit C-7.

In conclusion, the testimony of two police officers present at the raid of the "trap" house was amply sufficient to establish Tillery's guilt beyond a reasonable doubt and Tillery waived his claim of error in the admission of evidence. Moreover, the introduction of the police incident report prepared by one of the officers who testified at trial did not contribute to the verdict. Accordingly, we affirm the judgment of sentence.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/16/19</u>